# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF TEXAS

| | |
|---|---|
| THE NIELSEN COMPANY (US), LLC, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>TVSQUARED LTD., )<br>)<br>Defendant. )<br>) | C.A. No. 6:22-cv-00244<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT FOR PATENT INFRINGEMENT

The Nielsen Company (US), LLC ("Nielsen" or "Plaintiff"), for its Complaint against TVSquared Ltd. ("TVSquared" or "Defendant"), alleges as follows:

## NATURE OF THE ACTION

1. This is an action for patent infringement brought against Defendant for infringement of United States Patent No. 10,063,378 ("the '378 Patent"), attached hereto as Exhibit A.

## PARTIES

2. Nielsen is organized and existing under the laws of the state of Delaware.

3. According to TVSquared's website, TVSquared is a United Kingdom corporation registered in Scotland with its principal place of business at Fifth Floor, 1 Exchange Crescent, Conference Square, Edinburgh, Scotland, EH3 8UL. https://www.tvsquared.com/contact-us, attached hereto as Exhibit B. TVSquared is the parent company of a multinational conglomerate that conducts business under the TVSquared name in the United Kingdom, the United States, Germany, and Japan. *See id.; see also* https://www.tvsquared.com (noting that TVSquared

"measures and attributes the effectiveness of linear, CTV and addressable, delivering census-level analytics for thousands of advertisers across more than 75 countries,") attached hereto as Exhibit C. TVSquared may be served under the rules and procedures of the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents, pursuant to Federal Rule of Civil Procedure 4(h)(2).

## JURISDICTION AND VENUE

4. This is an action for patent infringement arising under the Patent Act, 35 U.S.C. §§ 1 *et seq*. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1338(a) (action arising under the Patent Act).

5. This Court has specific personal jurisdiction over Defendant consistent with the requirements of the Due Process Clause of the United States Constitution and the Texas Long Arm Statute. Defendant purposefully directs its infringing activities toward the United States in general and toward this District in particular.

6. As part of its accused infringing activities, TVSquared collects, analyzes, and correlates media content viewership data. According to TVSquared's website, TVSquared acquires this media content viewership data from 80 million households (*i.e.,* nearly two thirds of all households) in the United States. *See* https://www.tvsquared.com/data attached hereto as Exhibit D; https://www.census.gov/newsroom/press-releases/2021/families-and-living-arrangements.html, attached hereto as Exhibit E. Upon information and belief, many of TVSquared's 80 million households are located in Texas. *See, e.g.,* https://worldpopulationreview.com/state-rankings/households-by-state, attached hereto as Exhibit F (indicating Texas contains more households than any other state except California.).

7.      Not only are many of the households from which TVSquared collects data in Texas; so are the advertisers who purchase TVSquared's services.  To collect household data, TVSquared uses its "own JavaScript and image tags that [a client advertiser] can place on [the client advertiser's] website itself…." https://tvsquared.force.com/helpcentre/s/article/How-does-TVSquared-collect-my-data?language=en_US, attached hereto as Exhibit G.  Numerous companies located and based in this District use TVSquared's JavaScript and image tags on their websites.  *See, e.g.,* HTML code at www.UniversalToyota.com at lines 172-220 (Universal Toyota, San Antonio, TX, excerpts attached hereto as Exhibit H; HTML code at www.SAZoo.org at lines 748-772 (San Antonio Zoo, San Antonio TX), excerpts attached hereto as Exhibit I; HTML code at www.uiw.edu at lines 1194-1218 (University of the Incarnate Word, San Antonio, TX), excerpts attached hereto as Exhibit J; HTML code at www.UrologyAustin.com at lines 86-110 (Urology Austin, Austin, TX), excerpts attached hereto as Exhibit K; HTML code at www.LouisShanksFurniture.com at lines 58-74 (Louis Shanks Furniture, Austin/San Antonio, TX), excerpts attached hereto as Exhibit L; HTML code at www.RoundRockHyundai.com at lines 2490-2505 (Round Rock Hyundai, Round Rock, TX), excerpts attached hereto as Exhibit M; www.LivingstonLures.com at lines 282-286 (Livingston Lures, San Antonio, TX), excerpts attached hereto as Exhibit N.

8.      Moreover, TVSquared's website highlights particular "clients and partners" (other than the ones identified above) that are major United States companies with a presence in Texas such as BMW of North America, Burger King, Hulu, State Farm, and others. https://www.tvsquared.com/clients-and-partners, attached hereto as Exhibit O.

9.      In addition, according to its website, TVSquared collects data and provides products and services through servers located in the United States.  *See* "Will TVSquared web tags

3

cause latency issues on my website?", https://tvsquared.force.com/helpcentre/s/article/Will-TVSquared-web-tags-cause-latency-issues-on-my-website?language=en_US, attached hereto as Exhibit P.

10. Accordingly, TVSquared has established at least minimum contacts within Texas, and in this District in particular. TVSquared has purposefully availed itself of the benefits of conducting its activities in Texas and this District. Thus, the exercise of personal jurisdiction over TVSquared is appropriate and would not offend traditional notions of fair play and substantial justice. In addition, or in the alternative, this Court has personal jurisdiction over TVSquared pursuant to Federal Rule of Civil Procedure 4(k)(2).

11. Venue is proper pursuant to 28 U.S.C. § 1391(c)(3) because Defendant is not resident in the United States.

## FACTUAL BACKGROUND

12. Founded in 1923 by Arthur C. Nielsen, Nielsen is the media industry's leading data and analytics company. Nielsen fuels the industry with an accurate understanding of what people watch and listen to.

13. Measuring across all channels and platforms—from traditional linear television to streaming TV to social media and on-line video/audio platforms—Nielsen helps its clients and partners optimize the value of their marketing investments and growth strategies. Nielsen offers measurement and analytics in nearly 60 countries.

14. In the modern era of "Big Data," maintaining the security of personally-identifiable information ("PII") is of utmost importance. Indeed, the responsible stewardship of data under Nielsen's control has always been and continues to be a core value for the company. By employing its patented technology, Nielsen safeguards the privacy of the individuals from whom it obtains

4

data.

## THE ASSERTED PATENT

15. The '378 Patent, entitled "Methods and Apparatus to Collect Distributed User Information for Media Impressions and Search Terms," was duly and legally issued on August 28, 2018.

16. Nielsen is the assignee and owner of all right, title, and interest in the '378 Patent. The '378 Patent is valid and enforceable.

17. The claims of the '378 Patent are directed, among other things, to solving the problems experienced in the prior art regarding measuring exposure to media content across numerous platforms (television, Internet, etc.). *See, e.g.,* '378 Patent, Ex. A, 4:9-23, 5:34-6:2. In the prior art, aggregating information regarding audience exposure to media content across various platforms (*e.g.,* computers, televisions, apps running on mobile telephones, etc.) was problematic because it required pairing content exposure information with individuals' PII (*i.e.,* information that can be used to identify a user or device, such as device identifiers, app store identifiers, usernames, email addresses, software identifiers, and so on). *See id.,* 4:15-20, 8:2-14. This carried with it the risk of compromising the security of that information. *See id.*

18. The specification of the '378 Patent describes a solution to this problem: a method in which an audience measurement entity ("AME") aggregates measurement data by pairing impressions with pseudonyms derived from encrypted identifiers instead of PII. *See id.,* 4:28-35.

19. In one illustrative example set forth in the specification of the '378 Patent, an app (*e.g.,* a video game) is installed on the consumer's mobile device. *Id.,* 7:29-37. The consumer is presented with media content (*e.g.,* an advertisement, which is associated with a media ID that identifies it) while using the app, resulting in an "impression" (an exposure to the content). *Id.,*

4:5-8, 7:38-48. The mobile device then collects the media ID and one or more device/user identifiers (for example, a mobile equipment identifier) stored in the mobile device. *Id.*, 7:57-64. At that point, the app encrypts the device/user identifier and sends the encrypted identifier along with the associated media ID to the AME. *Id.,* 9:15-19, 9:45-54, 10:31-53. Appended to the encrypted device/user identifier sent from the app publisher to the AME is a non-encrypted indicator of which database proprietor (for example, the wireless provider associated with a mobile device) may be queried for information about the device or user. *Id.,* 10:18-31. Using that indicator, the AME sends the encrypted device/user identifier to the wireless provider or other database proprietor, which has the encryption key to decrypt the device/user identifier. *Id.,* 9:54-62. Once the wireless provider has decrypted the device/user identifier, it can access the PII of the user (who is its customer). *Id.*, 10:63-11:12. The wireless provider then sends user information without any PII to the AME. *Id.*

20. By aggregating data in this fashion (or similar fashion) from multiple database proprietors, the AME is able to measure audiences for particular media content across multiple platforms without pairing impression data to PII. *Id.,* 4:32-35.

21. The asserted claims of the '378 Patent recite specific implementations of the invention disclosed in the patent. In particular, the claims recite (1) the sending of an encrypted identifier of a device or a device user to a corresponding database proprietor from an audience measurement entity (via a network communication from a server of the audience measurement entity); (2) receiving user information corresponding to the encrypted identifier from the database proprietor; (3) associating the user information with a media impression accessed via the device or a search term collected at the device; and (4) other technical elements. *Id.*, Claims 1, 9, 11, 12, 20, 22, 23, 31, 33.

6

22. The provisional patent applications upon which the '378 Patent is based were filed in 2012. At that time, the combinations of elements recited in the asserted claims of the '378 Patent were not well-understood, routine, or conventional. *See id.,* 4:9-35.

23. The combinations of elements recited in the asserted claims of the '378 Patent solved a technological problem experienced in prior art systems. *See id.,* 2:54-5:10. More particularly, the combination recites a method of protecting the privacy of individuals whose exposure to media content is being measured. *See id.,* 4:32-35. A key aspect of this approach is the encryption of PII, such as information that identifies a device or device user, and the resolution of the encrypted identifier to non-PII related to the device or device user by a database proprietor. *See id.,* 4:24-54. This is an inventive concept that was not well-understood, routine, or conventional at the time of the invention. *See id.*

24. The combinations of elements recited in the asserted claims of the '378 Patent allow the AME to associate user information with media impressions without compromising individuals' PII. *See id.,* 4:24-5:60. This is a specific and technological solution to the problems of the prior art because it involves the use of encryption and decryption of PII in a particular way and results in a system that exhibits desirable technical features not found in the prior art. *See id.,* 4:24-54.

25. The asserted claims of the '378 Patent are not directed to abstract ideas. Rather, they are directed to a specific technical solution to the prior art problem of measuring media content audiences while protecting the security of individuals' personally-identifiable information. *See id.* In the prior art, it was not possible to leverage proprietors' databases to collect user information to associate with tracked media impressions in a manner that did not comprise the privacy of individuals, without using cookies. *See id.*

26. The approach recited in the asserted claims of the '378 Patent is one specific way to measure media content audiences. Other (less advantageous) approaches can be used, such as the pairing of PII to impression data in a shared database. *See id.,* 2:54-3:27. Thus, the asserted claims do not preempt the field of measuring media content audiences.

## THE INFRINGING PRODUCT

27. According to its website, TVSquared is an audience measurement company. https://www.tvsquared.com (noting that TVSquared "measures and attributes the effectiveness of linear, CTV and addressable, delivering census-level analytics for thousands of advertisers across more than 75 countries."), Ex. C.

28. Also, according to its website, TVSquared ingests data about advertisement viewership at the impression level from "80 million U.S. households and 150 million globally, processing more than 25 billion ad impressions each month." https://www.tvsquared.com/data, Ex. D.

29. According to Jo Kinsella, President of TVSquared, for each impression, TVSquared also ingests an identifier of the device that displayed the impression or the household where the impression was displayed. *See* "VAB Attribution & Outcomes Week: TVSquared," YouTube, uploaded by TVSquared Inc., Sept. 20, 2021, https://www.youtube.com/watch?v=RFlnCf0lKfM at 7:06 *et. seq*. ("When we talk about 150 million households globally that's our coverage. About 80 million in the U.S. tied to an IP address.").

30. Also, according to Jo Kinsella, TVSquared uses the Blockgraph solution for cross-platform measurement. "AdWeek Webinar: Reaching the Total Audience on TV," YouTube, uploaded by TVSquared Inc., Mar. 5, 2021, https://www.youtube.com/watch?v=Ad_lTpopD_I at

7:22 *et. seq.* ("We're super excited about TVSquared and Blockgraph working together. . . ."). In particular, according to Blockgraph, entities like TVSquared set up a private node on a server and retain control of that server. *See* https://www.blockgraph.co/solution/identity, attached hereto as Exhibit Q; *see also* "How Blockgraph Works: Schleider Combines ISP & TV Data," *YouTube*, uploaded by BeetTV, Jan. 11, 2022, https://youtu.be/LEaV9a2b7Jk at 1:52 et. seq. ("We're software that sits within a data owner's own infrastructure and we're peer-to-peer."). This node runs Blockgraph's Identity Operating System ("IDoS"). *See* https://www.blockgraph.co/solution/identity, Ex. Q.

31. According to Blockgraph, entities like TVSquared transfer impression data to their private node. *See* https://www.blockgraph.co/solution/cross-platform-measurement, attached hereto as Exhibit R. Each impression is associated with an identifier, which can be a mobile device identifier, a set-top box identifier, an IP address, or other identifier. *See id.* Using Blockgraph's IDoS, the TVSquared node encrypts this identifier. *See* https://www.blockgraph.co/solution/identity, Ex. Q ("Once installed, and after data has been loaded to your private node, Blockgraph's software establishes connectivity with Blockgraph's IDoS by assigning each record a unique encryption value which is used to deterministically assign a common persistent pseudonymous household identifier. This encryption all happens locally within each participant's own private node.").

32. According to Blockgraph, entities like TVSquared send the encrypted identifier from the TVSquared node to Blockgraph's identity resolution partner (*i.e.,* a database proprietor). *See* https://www.blockgraph.co/solution/cross-platform-measurement, Ex. R. Blockgraph's identity resolution partner is TransUnion. *See* https://www.transunion.com/blog/blockgraph-and-

transunion-partnering-to-deliver-privacy-focused-addressable-advertising-solutions, attached hereto as Exhibit S.

33. According to Blockgraph, the node then receives a Blockgraph ID, which is a pseudonymous household identifier, from TransUnion. *See* https://www.blockgraph.co/solution/cross-platform-measurement, Ex. R; https://www.transunion.com/blog/blockgraph-and-transunion-partnering-to-deliver-privacy-focused-addressable-advertising-solutions, Ex. S. This household identifier constitutes information about the user, as it is used to correlate activities of a user or household across multiple platforms. *See id.* TVSquared associates this household identifier with the corresponding impression data. *See* https://www.blockgraph.co/solution/cross-platform-measurement, Ex. R.

34. The paired impression and Blockgraph ID can be shared to a broader database for data aggregation by household. *See id.*

35. Through its products, methods, and activities, TVSquared infringes Claim 1 of the '378 Patent. TVSquared's infringement has harmed, and will continue to harm, Nielsen.

36. By this lawsuit, Nielsen seeks to enjoin TVSquared from any further unauthorized performance, making, use, importation, sale, or offering for sale of Nielsen's patented technology, and it seeks to recover damages, including lost profits, treble damages, reasonable attorneys' fees, and other such and further relief as the Court deems just and proper against TVSquared's violation of federal law.

## COUNT I
## INFRINGEMENT OF THE '378 PATENT

37. Nielsen repeats and re-alleges paragraphs 1-36 as if fully set forth herein.

38. TVSquared has infringed and continues to infringe, literally or under the doctrine of equivalents, claims 1, 9, 11, 12, 20, 22, 23, 31, and 33 of the '378 Patent under 35 U.S.C. § 271(a).

39. A claim chart explaining how TVSquared infringes the asserted claims of the '378 Patent is attached hereto as Exhibit U to this Complaint.

40. As of the filing date of this Complaint, TVSquared is aware of the '378 Patent and the manner in which it infringes the asserted claims. Accordingly, since that date, TVSquared has willfully infringed the '378 Patent.

41. Through the conduct alleged above, TVSquared has caused and will in the absence of an injunction continue to cause Nielsen to suffer damages, which in no event are less than a reasonably royalty, and which include, but are not limited to, lost sales and sales opportunities.

42. TVSquared has irreparably harmed Nielsen. Unless and until TVSquared is enjoined by this Court from further infringement, Nielsen will continue to suffer damages and irreparable injury for which it has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Nielsen prays for judgment against Defendant as follows:

1. A judgment declaring that Defendant has infringed the '378 Patent and that such infringement has been willful;

2. An order and judgment permanently enjoining Defendant and its officers, directors, agents, servants, employees, affiliates, and all others acting in privity or in concert with them, and their parents, subsidiaries, divisions, successors and assigns, from further acts of infringement of the '378 Patent;

3. A judgment awarding Nielsen all damages adequate to compensate for the Defendant's infringement of the '378 Patent, but in no event less than a reasonable royalty, for Defendant's acts of infringement, including all pre-judgment and post-judgment interest at the maximum rate permitted by law;

4. A judgment awarding Nielsen all damages, including treble damages, based on any infringement found to be willful and egregious, pursuant to 35 U.S.C. § 284, together with pre-judgment interest;

5. A finding that this case is "exceptional" within the meaning of 35 U.S.C. § 285;

6. A judgment ordering that Defendant pay Nielsen its reasonable attorneys' fees and expenses pursuant to 35 U.S.C. § 285; and

7. Such other and further relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff demands a jury trial on all issues so triable.

|  |  |
|---|---|
| OF COUNSEL:<br><br>Steven Yovits<br>Constantine Koutsoubas<br>KELLEY DRYE & WARREN LLP<br>333 West Wacker Drive<br>Chicago, IL 60606<br>Tel: (312) 857-7070<br><br>Clifford Katz<br>Malavika Rao<br>KELLEY DRYE & WARREN LLP<br>101 Park Avenue<br>New York, NY 10178<br>Tel: (212) 808-7800<br><br>Dated: March 4, 2022 | Respectfully submitted,<br><br>STECKLER WAYNE CHERRY & LOVE, PLLC<br><br>By: */s/ Mark D. Siegmund*<br>    Craig D. Cherry<br>    State Bar No. 24012419<br>    Mark D. Siegmund<br>    State Bar No. 24117055<br>    **STECKLER WAYNE CHERRY & LOVE, PLLC**<br>    8416 Old McGregor Road<br>    Waco, Texas   76712<br>    Telephone: (254) 651-3690<br>    Facsimile: (254) 651-3689<br>    craig@swclaw.com<br>    mark@swclaw.com<br><br>*Attorneys for Plaintiff The Nielsen Company (US), LLC* |